55 CCPA

**Application of Lewis E. REVEN.**

**Patent Appeal No. 7875.**

United States Court of Customs and Patent Appeals.

March 7, 1968.

Marzall, Johnston, Cook & Root, Richard L. Johnston, Herbert B. Keil, Chicago, Ill., for appellant.

Joseph Schimmel, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, SMITH, ALMOND and KIRKPATRICK,* Judges.

SMITH, Judge.

The sole issue for adjudication on the present record is whether appellant's claimed invention is obvious under 35 U.S.C. § 103 in view of the cited prior art.

■ The issue arises in an appeal from the decision of the Patent Office Board of Appeals,[1] adhered to on reconsideration, affirming the examiner's rejection of all of appellant's claims.[2]

The invention relates to a process for preparing stable and highly concentrated aqueous silica sols. Appellant explains that silica sols contain discrete particles of colloidal silica, $SiO_2$, dispersed in a liquid phase such as water. Appellant theorizes that the silica includes a plurality of functional hydroxide groups which are extremely reactive and tend to form links with other particles to produce a three-dimensional cross-linked polymer. In time, the colloidal particles aggregate and convert the sol into an undesirable gel, particularly when the sol is concentrated.

It is appellant's aim to produce sols of higher concentrations of colloidal silica yet having greater stability against gelation than conventional sols of lower concentrations. Appellant explains that a number of factors affect the gel forming tendencies of these sols, e. g., the concentration of the particular sol, its pH, the presence of impurities, the size of the particle, the $SiO_2$ to $Na_2O$ ratio, and the specific conductance of the sol.

The gist of appellant's invention resides in the discovery that the pH of the sol and the particle size of the dispersed

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. The board consisted of Messrs. Rosa, Examiner-in-Chief, and Stone and Vertiz, Acting Examiners-in-Chief. We note that the composition of the board is such that more than one Acting Examiner-in-Chief participated in this decision. For the view of the majority on such boards, as well as the views of Almond, J., and myself, seen In re Wiechert, 370 F.2d 927, 54 CCPA 957 (1967). While I continue to question the legality and jurisdiction of a board so constituted, neither issue was raised by appellant nor considered below. While I doubt that this can constitute a waiver of the jurisdictional defect, a majority of the court considers it to be otherwise, hence my participation in this decision.

2. Application Serial No. 185,840, filed April 9, 1962, for "Concentrated Silica Sols," denominated a continuation-in-part of appellant's copending application, Serial No. 23,358, filed April 20, 1960.

particles are of primary importance in determining its stability.

Appellant's specification states:

* * * The particle size should be between about 15 and 30 millimicrons, and the pH should be between about 8.7 and 9.5. Although the concentration of the sol can vary somewhat, the invention is particularly directed to sols having an $SiO_2$ content of from 48% to 52%. My preferred sol has an average particle diameter of from 18 to 24 millimicrons and a pH from about 8.7 to about 9.2. The $SiO_2$:$Na_2O$ ratio of the sols should be between about 150:1 to 350:1 and preferably from about 200:1 to about 250:1.

The method used to concentrate the sol can consist of merely boiling off water. The particle size of the sol before the boiling off step, however, should be between about 15 and 30 millimicrons. Ordinarily, the sol will have an $SIO_2$ concentration of from about 30% to about 38%. The pH of the final product must be from about 8.7 to about 9.5.

Appellant's specification further states that the prior art processes are not satisfactory to produce a stable sol having a concentration of greater than about 40% to 45% of dispersed particles, while appellant's product was found to be "highly stable" at concentrations "as high as 52%."

Three independent claims have been appealed. Claim 1 is illustrative:

1. A process for preparing a stable and concentrated silica sol which comprises preparing an aqueous silica sol containing from about 30% to about 38% $SiO_2$, said sol having a particle size of from about 15 to about 30 millimicrons, an $SiO_2$ to $Na_2O$ ratio of from about 150:1 to 350:1, and a specific conductance greater than $4 \times 10^{-4}$ mho/cm. at 28° C. and 10% $SiO_2$, boiling off water from said sol until the $SiO_2$ content of the sol is from about 48% to about 52%, and thereafter adjusting the pH of said sol to between about 8.7 and about 9.5.

Claims 2 and 3 more specifically limit the particle size to from about 18 to about 24 millimicrons and the pH to between about 8.7 and 9.2. Claim 3 also further limits the $SiO_2$ to $Na_2O$ ratio to from about 200:1 to 250:1.

The Patent Office relied upon the following patents to sustain the rejection:

Rule                    2,577,485    Dec. 4, 1951
 Wolter
 (Canadian)       521,742    Feb. 14, 1956

The Rule patent describes a process for making stable silica sols in which a silica sol is first prepared containing dense, non-agglomerated silica particles having an average diameter of from 10 to 130 millimicrons, and a specific conductance *less than* $4 \times 10^{-4}$ mho/cm. at 28° C. and 10% $SiO_2$. In preparing the sol to be treated, the Rule process includes the formation of a low molecular weight sol by a known process in which a sodium silicate solution is passed through an ion exchange material to remove most of the sodium ions and provide a silica sol having a high ratio of silica to sodium. The sol is then concentrated by another known method in which the silica particles are allowed to grow to a diameter of from 10 millimicrons to about 130 millimicrons. The ion content of a sol thus produced results in a specific conductance *greater than* $4 \times 10^{-4}$ mho/cm. at 28° C. and 10% $SiO_2$. Rule teaches that the ion content of the sol must be decreased, preferably by passing it through a cation exchanger. The use of an anion exchanger to remove anions is also said by Rule to be desirable.

An alkali metal hydroxide is added to the sol in an amount sufficient to provide a silica to alkali oxide mole ratio in the sol of from 130:1 to 500:1. These sols are said to be indefinitely stable at ordinary temperatures against gelation and stable for extended periods even at a temperature as high as 95° C.

Rule teaches that the aqueous sols may be concentrated to a very high silica content merely by boiling off water and that stable sols containing silica in proportions as high as "50% by weight or more" may be prepared. Rule points out that in a

specific embodiment giving especially advantageous results, the average particle size is from 15 to 30 millimicrons and, in one example, employed a starting sol containing 28.73% $SiO_2$.

The Wolter patent discloses a process for producing stable silica sols in which a sol containing from 20 to 35% $SiO_2$, having an average diameter of 10 to 150 millimicrons, is purified by 2 to 4 treatments with an anion exchanger and, preferably, also with a cation exchanger. The purified sol may be made more stable by the addition of ammonia, amines or strong acids. Wolter explains that the stability is less for the sols of higher concentrations, i. e., 30% and greater. According to Wolter, a 30% sol could be stabilized with ammonium hydroxide or with any organic nitrogen base which would not be objectionable in the particular use for which the sol is to be employed. The amount of organic nitrogen base or of ammonium hydroxide to use is the quantity required to raise the pH of the sol to a value from about 7 to 10 and preferably to values in the upper portions of this range. Wolter states that such sols may be stable for years at room temperature.

The patentee adds that, in a preferred sol, the particles have "an average diameter in the range of from 15 to 30 millimicrons," and that the "conductance of the completely deionized sols is less than 4 times $10^{-4}$ mho/cm. at 28° C. and 10% $SiO_2$." Instead of stabilizing the sol with a base, Wolter states that it may be stabilized with a small amount of an acid.

The examiner finally rejected all of appellant's claims as "unpatentable over Rule, alone or in view of Wolter." The board affirmed, stating:

The claims stand rejected as unpatentable over Rule, alone or in view of Wolter under 35 U.S.C. 103. The Examiner holds the claims are substantially met by Rule who subjects an aqueous silica sol substantially similar to that recited in the claim to a concentration step of boiling off water to produce a stable and concentrated silica sol within the proportions of silica claimed. He considers the specific conductance of appellant's starting material to differ merely in degree as compared with the starting material of the reference which has a conductance less than that recited and that the final adjustment of the concentrated silica sol to the designated pH to be [sic] obvious and within the skill of the art, relying on Wolter to show pH adjustment to the alkaline side for stabilizing silica sols.

\* \* \* \* \* \*

\* \* \* While appellant lays great emphasis on the fact that he does not use the ion exchange resin treatments used by the references, yet the claims do not exclude such treatment. The starting silica sol used by appellant does not appear to be materially different from that of Rule who uses a sol of 28.73% $SiO_2$, which is very close to the 30% recited in the claims.

We are not satisfied that the difference in the specific conductance of appellant's sol, which is greater than the standard recited while the reference is less than the standard, can in any way be regarded as a patentable distinction. At best, it appears to be a mere matter of degree. Furthermore, the fact that Rule obtains a final product which is just about as stable as appellant's and of substantially the same concentration, leads to the conclusion that the specific conductance used is of no patentable significance. We agree with the Examiner that the adjustment of pH as the final step would be obvious and within the skill of the art.

Appellant here urges, as he did below, that the claimed process produces unobvious results. He further argues that it could not possibly have been predicted that, by carefully controlling the characteristics of an intermediate or charge sol and by adjusting the pH of the final product within a narrow range, a highly concentrated stable silica sol could be produced. Appellant emphasizes that, in both the Rule and Wolter processes, it is necessary to treat the sol with an ion exchanger.

The factual differences between the appealed claims and the prior art must first be determined, 35 U.S.C. § 103. Appellant's charge sol has an $SiO_2$ concentration of from about 30% to about 38%; Rule discloses a sol having an $SiO_2$ concentration of 28.73%. We note that appellant does not emphasize this difference before this court.

Appellant claims a particle size of from about 15 to about 30 millimicrons. Rule discloses a much broader range, i. e., from 10 to 130 millimicrons, but states that in a specific embodiment giving "especially advantageous results," the average particle size is from 15 to 30 millimicrons. Similarly, Rule discloses a silica: alkali oxide mole ratio of 130:1 to 500:1, while appellant claims a $SiO_2:Na_2O$ ratio of 150:1 to 350:1. We think it sufficient to note that the range disclosed in Rule envelops the range claimed by appellant, and that appellant has produced no evidence tending to show superior results because of his selection of the narrower range within the disclosed range. The examiner noted, and we agree that, absent a showing to the contrary, discovering particular ranges within a range disclosed by the prior art would be within the skill of the art.

Appellant claims a specific conductance of the charge sol greater than $4 \times 10^{-4}$ mho/cm. at 28° C. and 10% $SiO_2$. Rule discloses that a specific conductivity less than $4 \times 10^{-4}$ mho/cm. is preferred for the higher concentration of $SiO_2$. The board considered this difference to be "at best * * * a mere matter of degree." This difference, however, is a factual difference which must be considered before reaching the legal conclusion of obviousness or nonobviousness under section 103. In re Krazinski, 347 F.2d 656, 52 CCPA 1447 (1965).

Appellant makes the related argument here that his claimed process produces sols which are "as stable" as those of Rule, without requiring a deionization step. This fact, in appellant's view, "provides the ingredient of unobviousness which makes the claims patentable over the art." Similarly, at oral argument, counsel for appellant urged that the claimed specific conductance is higher than that preferred by Rule to emphasize that appellant's process does not require a deionization step. Rule, however, teaches that the specific conductance of the sol is a function of deionization. More precisely, the specific conductance of the sol becomes lower as the cation and anion content of the sol is reduced.

Thus, the susbtance of appellant's argument is predicated upon an allegation that he achieves the same result as disclosed in the Rule reference without utilizing the step of deionization. We agree with the solicitor, however, that appellant's position is not supported by probative evidence in this record. The relevant disclosures in the Rule patent and in appellant's application as to stability of the sols provides support for the position of the solicitor that the appellant's sols have not been shown to be as stable as those produced by the Rule process. Thus, the position of the Patent Office is supported by the disclosures of the cited references. While we recognize certain factual differences between the claimed invention and the Rule disclosures, the burden of establishing the significance of such differences in evaluating the obviousness of the invention as a whole falls on the appellant. Appellant's failure to go forward with convincing proofs factually supporting this argument removes this question from the case.

Finally, appellant urges that the board erred in considering that adjustment of pH as claimed by appellant would be obvious. However, appellant has presented no persuasive argument which convinces us of error by the board in this respect. Wolter's disclosure is a clear teaching that, to be highly stable, a silica sol should have its pH adjusted to a value from about 7 to 10, but preferably values in the upper portions of this range which very nearly coincide with the claimed range.

Based upon the factual differences between appellant's claimed inven-

tion and the prior art evidenced by Rule and Wolter, we, like the examiner and the board, are not persuaded on this record that those differences are such that the claimed invention, *considered as a whole,* would have been unobvious under 35 U.S.C. § 103.

The decision of the board is therefore affirmed.

Affirmed.